## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

LEON CARMICHAEL, JR.,　　　　　:
　　　　Plaintiff,　　　　　　　　:
　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　:　　　　CIVIL ACTION 1:17-00087-KD-MU
　　　　　　　　　　　　　　　　:
JEFFERSON DUNN, *et al.*,　　　　:
　　　　Defendants.　　　　　　　:

### ORDER

This matter is before the Court on Plaintiff's Complaint (Doc. 1), Defendants' Motions for Summary Judgment (converted from Answers/Special Reports) (Docs. 39-42, 64-65, 83-84, 86, 102-103, 116-117, 128-131 and 154-155 per Docs. 122, 123, 151, 156), and Plaintiff's Response (Doc. 176); and non-party Mixon's Answer/Special Report (Docs. 128-129).

**I.**　　**Findings of Fact[1]**

**A.**　　**Background & Carmichael's Allegations**

This case is about a November 9, 2016 incident at Holman prison in Atmore, Alabama between inmates and Alabama Department of Correction Riot Team (CERT) members. On February 22, 2017, inmate Plaintiff Leon Carmichael, Jr. (Carmichael)[2] initiated this action against Defendants Charles Arthur,[3] Jeffrey Baldwin,[4] Darryl Brown,[5] Jermaine Bullard,[6] Grant Culliver[7] Jefferson Dunn,[8] Ernest

---

[1] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riveria Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[2] Proceeding *pro se* and *in forma pauperis*.
[3] ADOC Corr. Sergeant / CERT member. (Doc. 86 at 1).
[4] ADOC Corr. Officer / CERT member. (Id.)
[5] ADOC Corr. Officer / CERT member. (Id.; Doc. 65 (Aff. Brown)).
[6] ADOC Corr. Officer / CERT member. (Doc. 86 at 2).
[7] ADOC Associate Commissioner. (Doc. 40 at 2).
[8] ADOC Commissioner. (Doc. 40 at 1).

Duren,[9] Akeem Edmonds,[10] Terry Edwards,[11] Darryl Fails,[12] Harry Finklea,[13] Demetrives Fleeton,[14] Danny Fountain,[15] Marcus Gaston,[16] James Griffin,[17] Anthony Hadley,[18] Michael Harrison,[19] Teddy Jones,[20] Ashley Kidd,[21] DeJour Knight,[22] Johnathan Langford,[23] Aaron Lewis,[24] Jasper Luitze,[25] Larry McCovery,[26] Antonio McClain,[27] Nathan McQuirter,[28] Cordaro Melton,[29] C. Mitchell,[30] Jason Norris,[31] Alfie Pacheco,[32] Omar Parker,[33] Gregory Patterson,[34] John Pryor,[35] Terry Raybon,[36] Timothy Robinson,[37] Clifton Sanders,[38] Gary Scarborough,[39] Otis Smith,[40] Samuel Snelson,[41] Jesse Stanford,[42] Cynthia Stew-

---

[9] ADOC Corr. Officer / CERT member.  (Doc. 86 at 2).

[10] ADOC Corr. Officer / CERT member.  (Doc. 86 at 2).

[11] ADOC Corr. Sergeant / CERT member.  (Doc. 117 at 1; Doc. 117-1 at 1 (Aff. Edwards)).

[12] ADOC Corr. Captain. (Doc. 40 at 2).

[13] ADOC Corr. Sergeant / CERT member. (Doc. 86 at 2).

[14] ADOC Corr. Sergeant / CERT member. (Id.)

[15] ADOC Corr. Lieutenant / CERT member. (Id.)

[16] ADOC Corr. Sergeant / CERT member. (Id.)

[17] ADOC Corr. Lieutenant / CERT member. (Id.)

[18] ADOC Corr. Sergeant / CERT member. (Id.)

[19] ADOC employee / CERT member.  (Doc. 154 at 2).

[20] ADOC Corr. Officer.  (Doc. 86 at 2).

[21] ADOC Corr. Lieutenant at Holman.  (Doc. 40 at 1).

[22] ADOC Corr. Sergeant / CERT member.  (Doc. 86 at 3).

[23] Corizon Health, Inc. LPN Jonathan Langford, employed at Holman from 3/1/16-4/17.  (Doc. 42 at 1 at n.3). He has been a licensed LPN since March of 2007 and is currently licensed in the State of Alabama.  (Id.)

[24] ADOC Corr. Officer / CERT member. (Doc. 86 at 3).

[25] ADOC Corr. Sergeant / CERT member.  (Id.)

[26] ADOC Corr. Lieutenant / CERT member.  (Id.)

[27] ADOC Corr. Captain / CERT member.  (Id.)

[28] ADOC Corr. Officer / CERT member.  (Id.)

[29] ADOC Corr. Sergeant / CERT member.  (Doc. 131 at 5).

[30] Carmichael's intended defendant is Phillip Mitchell, ADOC Correctional Warden I at Holman.  (Doc.40 at 2; Doc. 86 at 3).  The **CLERK** is **DIRECTED** to correct the docket to reflect Phillip Mitchell.

[31] ADOC Corr. Sergeant / CERT member. (Doc. 86 a 3).

[32] ADOC Corr. Lieutenant / CERT member. (Id.)

[33] ADOC Corr. Sergeant / CERT member. (Id.)

[34] ADOC Corr. Officer / CERT member. (Id. at 4).

[35] ADOC Corr. Lieutenant / CERT member.  (Id.)

[36] ADOC Corr. Warden II at Holman. (Doc. 40 at 2).

[37] ADOC Corr. Officer / CERT member.  (Doc. 86 at 4).

[38] ADOC Corr. Officer / CERT member.  (Id.)

[39] ADOC Corr. Warden / Officer at Holman.  (Doc. 40 at 1; Doc. 86).

[40] ADOC Corr. Captain / CERT Commander (Central).  (Doc. 103 at 4; Doc. 103-1 (Aff. Smith)).

[41] ADOC Corr. Officer/ CERT Leader (North Central).  (Doc. 86 at 4; Doc. 64 (Aff. Snelson).

[42] ADOC Corr. Sergeant / CERT member.  (Doc. 131 at 5).

art,[43] William Streeter,[44] Steve Terry,[45] J. Corbin Tunstall,[46] Timothy Vignolo,[47] Bradley Walker,[48] N. Walls,[49] Dominic Whitley,[50] and Jesse Wilson.[51]  Specifically, Carmichael asserts 42 U.S.C. § 1983 violations (use of excessive force, "impl[e]mentation of the procedures used," failure to protect/intervene, and denial of medical care); "state law claims of assault & battery[;]" and claims for slander and harassment.  (Doc. 1).  The relief Carmichael seeks includes compensatory and punitive damages, $200,000 per defendant, declaratory, injunctive, and trial by jury.

Per Carmichael, the force used against him on November 9, 2016 was rooted in an earlier incident. On November 7, 2016, CERT members and other correctional officers entered his dorm (Bravo Unit or B-Dorm) to conduct an institutional count of the inmates.  (Doc. 1 at 5).  At the time, inmates had "makeshift tents" on their beds to "gain some space" from other inmates with whom they share "the 5'x 6' living area."  (Id.)  Officers ordered inmates to remove the tents. (Id.)

As alleged by Carmichael, two (2) days later on November 9, 2016, CERT entered Holman's B-Dorm (when he was still asleep), began harassing and assaulting inmates,[52] and used excessive force against him.  (Doc. 1 at 5).  Carmichael describes the incident as follows:

> ….I was awaken by loud screaming and yelling….the lights clicked on and I saw…the ADOC riot team (Cert Team) in the dorm…jumping on inmates and yelling for everybody to get on our stomachs, put our hands behind our heads and cross our legs. I immediately turned on my stomach, put my hands behind my head and crossed my legs. All I could hear

---

[43] ADOC Corr. Warden III at Holman.  (Doc. 40 at 2).

[44] ADOC Corr. Warden / Officer / CERT member. (Doc. 86 at 4).

[45] ADOC Corr. Lieutenant / CERT member.  (Id.)

[46] ADOC Corr. Officer / CERT member.  (Id.)

[47] ADOC Corr. Officer at Holman.  (Doc. 40 at 2).

[48] ADOC Corr. Lieutenant / CERT member.  (Id.)

[49] Carmichael's intended defendant is LPN Ashley Wall. The **CLERK** is **DIRECTED** to correct the docket to reflect Defendant Ashley Wall.

[50] ADOC Corr. Officer.  (Doc. 86 at 5).

[51] ADOC Corr. Sergeant / CERT member. (Id.)

[52] Carmichael alleges that CERT stated: 'Where the GD's, Crips and Bloods at now', 'Aryan Brotherhood and Nations where yall at', 'on C.E.R.T. We will beat your Ass', Yall Bitches and Fuck Niggers stood up the other day Standup now'… 'Yall stabbed Warden Davenport and Killed Officer Bettis, pull something out now on C.E.R.T. we will beat your Ass.'"  (Doc. 1 at 5-6).

was inmates being jumped on and screaming. …the riot team (Cert team) officers started singling out inmates…and jumping on them…

A riot team officer came to my bed, put his hand in the middle of my back and said, "When I tell you too…Put your hands behind your back." And I said ok. He then told me, "put your right hand behind your back" and he put a tie cuff tightly on. Then…he did the same thing on my left wrist….Then I heard Warden/Cert team officer **Streeter** say "I'm looking for …Carmichael…Riot team (Cert team) officers throughout the dorm started yelling my name and asking where I was….I said, "I'm Carmichael."….**Streeter** said, "Yeah, that's him. Bring him on up here too." The White officer grabbed me by my arm, pulled me off my bed and slammed me on the floor. I was immediately punched in the face, stomped, kicked and poked in my back and the back of my leg with a riot baton….I was snatched up and walked up the [a]isle I was slapped by (Cert team) riot team officers on both sides of the [a]isle….COI **McQuieter** [sic] walked up and said, "Hold that motherfucker up", the White riot team officer (Cert team) officer hooked both of his arms threw [sic] mine from behind and picked me up on my tip toes and Officer **McQuieter** [sic] speared me in my chest, my ribs with his riot baton. I was again slammed to the floor, punched, slapped, kicked and poked in the back and leg with riot batons….

I was dragged to the front of the dorm and thrown to the floor….There were 3 or 4 inmates there already that had also been beaten…I was then taken to the bathroom area where several other inmates that had been beaten were. About 20 minutes later I was taken to the infirmary. On the way there a riot team (Cert team) officer told me, " Don't say shit unless asked a question. Keep your fucking mouth shut. Answer the nurse and that's it. Say anything and that's your ass!!". When I got in the infirmary the nurse asked me my name, AIS #, took my blood pressure and my temperature. Without even looking at or examining me she said, "okay he can go." I started to tell her that I couldn't breath [sic] and the riot team (Cert team) officer slapped me in the mouth, busted my lip and said "Bitch didn't I tell you to shut the fuck up? The nurse said  you can go. Say something else and Im [sic] going to fuck you up." I was taken from the infirmary and never examined for injuries….taken back to B-Dorm and placed back in the bathroom area…later I was taken to segregation….

Every day…I also told them [Cert team officer, Sgt. Lt. and COI]…that I could not breath [sic], I could barely walk or stand up and that I was in pain. They all told me to tell the nurse at pill call. At pill call the nurses told me to fill out a sick call slip. Every day I filled out and turned in sick call slips but was never taken to the infirmary….I continued to complain to every officer, the segregation review board Warden **Raybon** and the pill call nurses every time they came around about me not being able to breath [sic], not being able to stand, put pressure or walk on my right leg and the pain I was in. I keep putting in sick call forms but nothing never happened. The day before Thanksgiving COI Officer **McCants**…asked me if I wanted to go to sick call and I said yes.

When I got to sick call Nurse Dixon and Nurse **Walls** saw the extent of my injuries and asked me how did it happen. I told them and they asked me had I been in the condition I was in since Nov 9th and I said yes. Nurse **Walls** said take me to the infirmary immediately to see the doctor….The Dr saw me and immediately asked me how long Id [sic] been like I was and what happened.  After I told him he too asked me had I been in a lock up cell …since Nov. 9th and I said yes. …The Dr…had the X ray tech called to the institution immediately, had 8 X rays done of my leg and ribs and called his supervisor who told him

to get me to the emergency room immediately after he informed his supervisor of the X ray results and his examination of my injuries. Captain **Fails** tried to just bring me back to segregation but the Dr told him that I had to be rushed to the emergency room….Captain Fails was making excuses….the Dr instructed Captain **Fails** to have me placed on the infirmary medical ward. I was left on the medical ward from 11 something that morning until after 7:00 pm after the Dr left before Captain **Fails** finally had Lt. **Kidd** and COI **Villignoli** [sic] taken me to Atmore Hospital…The Dr had my leg X ray'd….three (3) hours later I was given pain meds and muscle relaxer and told by the Dr that I had several broken ribs, contusions and no broken bones in my leg….I NEVER did anything for this to happen to me. I was also given two (2) disciplines and never taken to disciplinary court on either of them. I asked Warden **Raybon** why I was assaulted…he told me that sometimes its [sic] just best for me to keep my mouth closed….I was assaulted [and] denied medical treatment for 2 weeks and placed in segregation for no reason what so ever [sic]…..

(Doc. 1 at 6-13 (emphasis added as to specifically named defendants)).

In response to the summary judgments, Carmichael submits his affidavit and the affidavits of two (2) witnesses, to support his allegations. (Doc. 176-1 (Aff. Carmichael); Doc. 176-2 (Aff. Byer); Doc. 176-3 (Aff. Johnson)). Per Byer:

....I saw Carmichael laying on his bed. There was 5 or 6 Cert team officers around his bed. A White Cert team officer snatched him off his bed and slammed him on the floor and they started punching him, kicking him, and hitting him with their Riot Batons. After they beat him he was snactched [sic] up and walked up the aisle to the front of the dorm between Cert. Team officers lined up on both sides. Different Cert team officers slapped him as he was walking up dthe [sic] isle. As he got to the front of ... the dorm I saw the White officer grab him by the arm from behind and I saw Officer McQuirter, run up and start to poke Carmichael with his stick several times and he was thrown and slammed back to the floor and they jumped on him again. I saw officer Bullard run over to Carmichael and started jumping on him too. He hit him with a stick and then started punching him....

(Doc. 176-2 at 2 (Aff. Byer)). And per Johnson: "The Cert Team ... went inside B- dorm ... I could hear the inmates yelling and screaming as they were being assaulted by the Cert Team while Warden Stewart, Warden Mitchell and Captain Baldwin watched." (Doc. 176-3 at 2 (Aff. Johnson)).

## B.   Defendants' Answers & Special Reports

Defendants have answered the suit denying the allegations against them and filed special reports in support of their positions. Specifically, on December 7, 2017, **ADOC Defendants Culliver, Dunn, Fails, Kidd, Mitchell, Raybon, Scarbrough, Stewart** and **Vignolo** answered, denying the allegations, and filed special reports and affidavits in support of their positions. (Doc. 39; Doc. 40 (nine (9) ADOC

Defendants)).  The Holman Duty Log (duty log) reveals CERT entered Holman at <u>6:48 a.m.</u> with Streeter

and Fails, to conduct an institutional search of inmates.  (Doc. 40-2 at 4).  The November 9, 2016 timeline,

for the relevant defendants, states as follows:

| | |
|---|---|
| 6:19 a.m. | Scarbrough outgates inmate Abrams to Dr. Bryant |
| 6:28 a.m. | Wall enters Holman |
| 6:40 a.m. | institutional count in progress with Kidd supervising |
| 6:43 a.m. | Warden Stewart and Warden Mitchell enter Holman |
| 6:48 a.m. | CERT members and Warden Streeter enter Holman |
| 6:48 a.m. | Fails enters Holman |
| 7:25 a.m. | Kidd announces institutional count is clear |
| 7:55 a.m. | Warden Raybon enters Holman |
| 10:10 a.m. | Institutional count in progress with Kidd supervising |
| 10:40 a.m. | Kidd announces institutional count is clear |
| 11:50 a.m. | Pill call in progress with CERT members providing security on main hall Nurse Dixon conducting pill call |
| 2:47 p.m. | LPN Wall and Dixon exit Holman |
| 3:15 p.m. | Inmate Abrams returned from outgate, |

(Doc. 40-2 at 4-7).

Additionally, as part of *these* defendants' special report is the November 9, 2016 Incident report,

November 9, 2016 Duty Officer Report, disciplinary records,[53] medical records, and nine (9) affidavits.

(<u>Id</u>.)  The following is asserted within same:

- **Defendant Culliver** asserts he was not at Holman.  (Doc. 40-8 at 2 (Aff. Culliver)).  Culliver admits that "my responsibilities ... include overseeing the day to day operations of all male adult correctional facilities in the state of Alabama and oversight of ...[CERT]....." (<u>Id</u>. at 1).

- **Defendant Dunn** asserts he "has no personal knowledge" of the incident, did not handle the day-to-day operations at Holman, and did not see any grievance from Carmichael so "felt no need to have the matter investigated."(Doc 40-1 at 1 (Aff. Dunn)). [54]

- **Defendant Fails** asserts: "I was present during the....time of the alleged incidents for assault and battery, or excessive force....Once the CERT team commanders entered the dorm, they oversaw the search...and I left the dorm and return [sic] to my Office."  (Doc. 40-9 (Aff. Fails)).  Fails also states he did not deny Carmichael medical care.

---

[53] Carmichael was charged with gathering in a threatening/intimidating manner on November 7, 2016, but was found not guilty due to a due process violation (untimely service of the charges on him).  (Doc. 40-10 at 1, 3).

[54] Dunn does <u>not</u> specifically assert that he was absent from either Holman or B-dorm.

- **Defendant Kidd** asserts that though at Holman, she was not present in the B-Dorm. (Doc. 40-3 at 1 (Aff. Kidd)). Kidd was assisting an institutional shakedown of female employees entering the facility <u>and</u> "supervising the institutional count." The duty log confirms such for Kidd- supervising the count from 6:40 a.m. - 7:25 a.m. (Doc. 40-2 at 4).

- **Defendant Mitchell** asserts he was not present. (Doc. 40-4 at 2 (Aff. Mitchell)). This assertion does not differentiate as to Mitchell's presence in the B-Dorm versus at Holman. The duty log reveals that Mitchell entered Holman at 6:43 a.m., so the Court interprets this as Mitchell denying his presence in B-Dorm.[55]

- **Defendant Raybon** asserts he was not present because he arrived at Holman *after* the incident occurred, at 8:00 a.m. (Doc. 40-5 at 1 (Aff. Raybon)). This is supported by the duty log showing he arrived at 7:55 a.m. (five (5) minute difference). Raybon states that he did not deny medical care to Carmichael and that his allegations are not truthful.

- **Defendant Scarbourgh** asserts he was not present because he left Holman at 6:19 a.m. and did not return until 3:15 p.m., which is supported by the duty log. (Doc. 40-2 at 1 (Aff. Scarbrough).

- **Defendant Stewart** asserts she was not present. (Doc. 40-6 at 2 (Aff. Stewart)). This assertion does not differentiate as to Stewart's presence in the B-Dorm versus at Holman. The duty log reveals Stewart entered Holman at 6:43 a.m., so the Court interprets this as Stewart denying she was present in B-Dorm.[56]

- **Defendant Vignolo** asserts that while present at Holman and initially present in the B-Dorm, a CERT Commander instructed him to exit B-Dorm and provide security on the Main Hall at some point during the incident. (Doc. 40-7 at 1 (Aff. Vignolo)). Vignolo states that Carmichael did not ask him for help or notify him of any injuries.

On December 15, 2017, **Defendants Langford** and **Wall**, Corizon Health, Inc. nurses who worked at Holman, answered and filed a special report with declarations and an affidavit. (Doc. 41; Doc. 42).

This includes the affidavit of non-party Shirley Johnson, and declarations of defendants Langford and Wall and non-parties Dr. Manual Pouparinas and Kimberly McCants:

- **Defendant Langford** was an LPN at Holman and his first contact with Carmichael occurred on 11/25/16, when he provided medications and assessed his symptoms. (Doc. 42-3 (Decltn. Langford)). Langford did not detect that he needed medical attention, nor did Carmichael request same.

---

[55] This is disputed. And per Johnson: "Cert... went inside B- dorm ... I could hear the inmates yelling and screaming as they were being assaulted by the Cert Team while ... Warden Mitchell ... watched." (Doc. 176-3 at 2 (Aff. Johnson)).

[56] This is disputed. And per Johnson: "Cert... went inside B- dorm ... I could hear the inmates yelling and screaming as they were being assaulted by the Cert Team while ... Warden Stewart ... watched." (<u>Id</u>.)

- **Defendant Wall** was an LPN at Holman and her first contact with Carmichael occurred on 11/23/16 for a sick call. (Doc. 40-17; Doc. 42-4 (Decltn. Wall)). At that time Carmichael complained of discomfort in his chest and right knee; she detected tenderness in the left rib area and a nodule underneath his right nipple and noted he could not apply his weight on his right knee. She referred him for a medical exam, and a doctor examined him, prescribed medication, ordered diagnostic tests, and referred him to a hospital for further assessment.

- **Non-Party Johnson**[57] was an LPN serving as the pharmacy manager at Holman on 11/9/16. (Doc. 42-1 (Aff. Johnson)). On 11/9/16, she received instructions to complete a body chart on Carmichael due to the unavailability of other nursing staff. She did not detect any injury, bruising, lacerations or markings of any kind on his body. His vital signs were largely normal, with only a slightly elevated temperature which did not indicate trauma or significant internal injuries. He did not complain of injury, discomfort or attempt to speak with her. She did not observe an officer slap him or threaten him to keep him from communicating with anyone. Johnson contends that he had seen a busted lip, she would have documented it, reported any mistreatment, and ensured he could convey any concerns. Per Johnson, Carmichael's allegations are completely false.

- **Non-Party McCants** asserts that since 4/17/16, she has been employed as the Health Services Administrator at Holman. (Doc. 42-5 (Decltn. McCants)). McCants states that Carmichael never submitted a medical grievance or appeal regarding any medical issues.

- **Non-Party Pouparinas** (physician and Medical Director at Holman) asserts that Carmichael's sick call request slip dated 11/10 may be incorrect as inmates often put incorrect dates on slips. (Doc. 42-2 (Decltn. Pouparinas)). Upon learning of Carmichael's request for medical care through the 11/10 slip, the staff scheduled an appointment for 11/23. He is not of aware of any staff member ignoring any complaints from Carmichael between 11/10 and 11/23.

On March 8, 2018, **Defendants Brown** (ADOC officer / CERT member) and **Snelson** (ADOC officer / CERT leader) filed affidavits stating as follows:[58]

- **Defendant Brown** states he was present and assisted CERT in securing inmates in flex cuffs behind the back, and escorted inmates through the dorm. (Docs. 65 (Aff. Brown); 84-3 (Aff. Brown)).

- **Defendant Snelson** states he was present and assisted CERT in securing inmates in flex cuffs behind the back, and escorted inmates through the dorm. (Docs. 64 (Aff. Snelson) (also attesting to his "monitoring" of CERT members); 84-25 (Aff. Snelson)). Snelson states he never saw Carmichael "to my knowledge" and never used any force on him.

---

[57] She "do[es] not routinely provide nursing care[]" though may if "circumstances...require." (Id.)

[58] Brown and Snelson filed a subsequent Supplemental Answer and Special Report (Docs. 83, 84).

On June 15, 2018, **31 CERT defendants**[59] (including Warden/CERT member **Defendant Streeter)** appeared, answered denying the allegations, and filed a special report (adopting/incorporating the ADOC report/exhibits (Doc. 40), with affidavits in support. (Doc. 83; Doc. 84 at 1, 5 at notes 1 and 2; Doc. 40-12 at 5-35; Docs. 84-1 to 84-31 (affidavits)). As an initial matter, these Defendants endeavor to adopt/incorporate all of Doc. 40's exhibits including 11 unsigned/unsworn and 21 signed/unsworn statements.[60] Such is improper and they have not been considered.[61] The Court has considered the 31 signed and sworn affidavits.[62] These documents reveal the following assertions:

- **Defendant Arthur** (ADOC SGT / CERT Commander) asserts he was present. (Doc. 84-1 (Aff. Arthur)). Per Arthur (emphasis added):

    .... November 9, 2016 at approximately 6:35 a.m., ... CERT ...entered B-Dormitory to arrest the suspects ... from ... November 7, 2016, and to confiscate the prison made weapons. ...

---

[59] Charles Arthur, Jeffery Baldwin, Daryl Brown, Jermaine Bullard, Ernest Duren, Akeem Edmonds, Harry Finklea, Demetrives Fleeton, Danny Fountain, Marcus Gaston, James Griffin, Anthony Hadley, Teddy Jones, DeJour Knight, Aaron Lewis, Jasper Luitze, Antonio McClain, Larry McCovery, Jason Norris, Alfie Pacheco, Omar Parker, Gregory Patterson, John Pryor, Timothy Robinson, Clifton Sanders, Samuel Snelson, William Streeter, Steve Terry, Corbin Tunstall, Bradley Walker, and Jesse Wilson.

[60] Unsworn: Doc. 40-12 at 4 (McQuirter); Doc. 40-12 at 6 (McClain); Doc. 40-12 at 7 (Gaston); Doc. 40-12 at 8 (Pachecho); Doc. 40-12 at 10 (Knight); Doc. 40-12 at 11 (McCovery): Doc. 40-12 at 12 (Fountain); Doc. 40-12 at 15 (Pryor); Doc. 40-12 at 16 (Ballard); Doc. 40-12 at 19 (Whitley); Doc. 40-12 at 20 (Finklea); Doc. 40-12 at 22 (Patterson); Doc. 40-12 at 23 (Terry); Doc. 40-12 at 24 (Wilson); Doc. 40-12 at 26 (Griffin); Doc. 40-12 at 27 (Stanford); Doc. 40-12 at 28 (Arthur); Doc. 40-12 at 31 (Jones); Doc. 40-12 at 32 (Hadley); Doc. 40-12 at 34 (Walker); Doc. 40-12 at 35 (Dennis). Unsigned and unsworn: Doc. 40-12 at 5 (Harrison); Doc. 40-12 at 9 (Fleeton); Doc. 40-12 at 13 (Baldwin); Doc. 40-12 at 14 (Brown); Doc. 40-12 at 17 (Snelson); Doc. 40-12 at 18 (Sanders); Doc. 40-12 at 21 (Parker); Doc. 40-12 at 25 (Luitze); Doc. 40-12 at 29 (Lewis); Doc. 40-12 at 30 (Tunstall); Doc. 40-12 at 33 (Edmonds).

[61] See, e.g., *Dudley v. City of Monroeville, Ala.*, 446 Fed. Appx. 204, 207 (11th Cir. 2011) ("Unsworn statements do not meet the requirements of Rule 56, so the district court could not—and properly did not—rely on the content of the citizen's statement[]"); *Vondriska v. Cugno*, 368 Fed. Appx. 7, 8–9 (11th Cir. 2010) ("....to support a motion for summary judgment under Rule 56(e), testimony must be sworn, competent and on personal knowledge, and set out facts that would be admissible in evidence at trial[]"); *McCaskill v. Ray*, 279 Fed. Appx. 913, 915 (11th Cir. 2008) (litigant's unsworn allegations were not admissible on motion for summary judgment); Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991) (same).

[62] (Docs. 84-1 (Aff. Arthur); Doc. 84-2 (Aff. Baldwin); Doc. 84-3 (Aff. Brown); Doc. 84-4 (Aff. Bullard); Doc. 84-5 (Aff. Duren); Doc. 84-6 (Aff. Edmonds); Doc. 84-7 (Aff. Finklea); Doc. 84-8 (Aff. Fleeton); Doc. 84-9 (Aff. Fountain); Doc. 84-10 (Aff. Gaston); Doc. 84-11 (Aff. Hadley); Doc. 84-12 (Aff. Jones); Doc. 84-13 (Aff. Knight); Doc. 84-14 (Aff. Lewis); Doc. 84-15 (Aff. Luitze); Doc. 84-16 (Aff. McClain); Doc. 84-17 (Aff. McCovery); Doc. 84-18 (Aff. Norris); Doc. 84-19 (Aff. Parker); Doc. 84-20 (Aff. Pacheco); Doc. 84-21 (Aff. Patterson); Doc. 84-22 (Aff. Pryor); Doc. 84-23 (Aff. Robinson); Doc. 84-24 (Aff. Sanders); Doc. 84-25 (Aff. Snelson); Doc. 84-26 (Aff. Streeter); Doc. 84-27 (Aff. Terry); Doc. 84-28 (Aff. Tunstall); Doc. 84-29 (Aff. Walker); Doc. 84-30 (Aff. Wilson); Doc. 84-31 (Aff. Griffin)). See also Doc. 64 (Aff. Snelson), Doc. 65 (Aff. Brown)).

... CERT ... entered .... there appeared to be over 100 inmates in there, many of whom were aggressively and angrily jumping up and down and ready to confront us. .... inmates had succeeded in running a CERT team out of that dorm (2) two days before .... and fully expected to be successful again.

.... some of the inmates in there were also talking real loud and cursing. They were swapping beds and many inmates had weapons. One inmate was lying on his bed with three (3) knives under him. Also, inmate made tents were still up ... and inmates were jumping out from behind these tents with weapons.

.... all inmates were given orders to lie down on their assigned beds and to place their hands behind their backs. ... Carmichael... was acting out again .... near an area where someone was heard hollering "knife" with other combative and noncompliant inmates. ... Carmichael was angrily defiant and refused to comply with direct and repeated orders that were given for him to lie down on his signed bed and put his hands, behind his back.

Given the overall threatening circumstances including ... Carmichael's hostile conduct and his outright refusal to comply with direct and repeated orders, officers were left with no choice but to use the minimal physical force needed, which included basic riot baton movements, to gain control over Carmichael and this increasingly dangerous situation.

The use of force was terminated once ... Carmichael's resistance ceased and ... Carmichael was able to be placed in the appropriate restraints. The minimum amount of force necessary was used to control the situation. ... Carmichael was escorted on foot to the health care unit where he was medically evaluated the morning of November 9, 2016. He was reassigned to segregation where he was escorted on foot. Disciplinary action was initiated against ... Carmichael for gathering in a threatening or intimidating manner, unauthorized possession of a weapon or device that could be used as a weapon, inciting a riot or rioting, and failure to obey a direct order of an ADOC employee. The CERT team searched ... Carmichael's assigned living area and discovered and confiscated a knife.

**At no time did I.....observe any type of abusive or excessive force being used against ... Carmichael. I did not use any type of force against ... Carmichael**...all allegations .... are false and full of malice. All actions on my behalf were made in a professional manner and within the scope of my duties.

- **Defendant Baldwin** (ADOC OFF / CERT Commander) asserts he was present and instructed CERT to dress in full riot gear (helmet with shields, arm/elbow pads, ballistic vests and knee/shin guards) and to give direct orders to inmates to lie face down on their beds and cross their legs at the ankles. (Doc. 84-2 (Aff. Baldwin)). Baldwin instructed the ballistic shields to enter into the dorm first, followed by the 12 gauge shotguns with less lethal ammunition and 37 mm less lethal gas guns to be staged strategically at the front. Baldwin instructed CERT rovers to enter and patrol the two aisles inside to ensure all inmates were in compliance with the orders issued. Ballard instructed CERT rovers to secure all inmates with flex cuffs behind the back and to search all inmates and their property for weapons and contraband, once secured. The minimal amount of force was used on inmates that were non-compliant. The force used was necessary and justified to gain control of the inmates to be secured, at which point all force stopped. Any inmate that force was used

10

on was taken to infirmary for medical evaluations and body charts. Inmates that were identified by Warden Streeter for having weapons and causing problems in B-block were placed in segregation.

- **Defendant Brown** (ADOC OFF / CERT member) asserts he was present and assisted in restraining multiple unidentified inmates with flex cuffs behind their backs and escorted them to the front of the dorm. (Doc. 84-3 (Aff. Brown)).

- **Defendant Bullard** (ADOC OFF / CERT member) asserts he was present and entered to arrest Carmichael. (Doc. 84-4 (Aff. Bullard)). Carmichael had communicated an intent to inflict harm to staff with a weapon and engaged in conduct with other hostile inmates which created a substantial risk of institutional security. Carmichael became combative and refused to comply with the orders which lead to CERT's usage of physical force that included basic riot baton movements to gain control. The use of force was terminated once his resistance ceased and he was placed in restraints. The minimum amount of force necessary was used to control the situation. Carmichael was medically evaluated and reassigned to segregation pending disciplinary action. Bullard did not observe any abusive or excessive force being used against Carmichael by CERT and claims that all allegations are false and full of malice because the actions were made in a professional manner and within the scope of his duties.

- **Defendant Duren** (ADOC SGT / CERT member) -- same assertions as Arthur *supra*. He denies using any force against Carmichael. (Doc. 84-5 (Aff. Duren)).

- **Defendant Edmonds** (ADOC OFF / CERT member) asserts he was present and assigned the 12-gauge bean bag, less lethal shotgun, positioned at the front left of the dorm. (Doc. 84-6 (Aff. Edmonds)). He maintained that post and did not observe any abuse, assaults, or excessive force.

- **Defendant Finklea** (ADOC SGT / CERT member) --- same assertions as Arthur *supra*. He denies using any force against Carmichael. (Doc. 84-7 (Aff. Finklea)).

- **Defendant Fleeton** (ADOC SGT / CERT member) asserts he was present but did not observe any abuse, assault, or use of excessive force. (Doc. 84-8 (Aff. Fleeton)). He believes Carmichael's claims are unfounded.

- **Defendant Fountain** (ADOC LT / CERT member) -- same assertions as Arthur *supra*. He denies using any force against Carmichael. (Doc. 84-9 (Aff. Fountain)).

- **Defendant Gaston** (ADOC SGT / CERT member) asserts he was present but did not use any force on Carmichael. (Doc. 84-10 (Aff. Gaston)).

- **Defendant Griffin** (ADOC LT / CERT member) asserts he was present in B-dorm, was assigned carried a shotgun with less lethal ammo, "held security" on top of the bathroom wall with his shotgun at "port arms," and did not use any force on Carmichael. (Doc. 84-31 (Aff. Griffin)).

- **Defendant Hadley** (ADOC SGT / CERT member) -- same assertions as Arthur *supra*. He denies using any force against Carmichael. (Doc. 84-11 (Aff. Hadley)).

- **Defendant Jones** (ADOC OFF / CERT member) asserts he was present and assisted CERT. (Doc. 84-12 (Aff. Jones)). He states he was "up front with the chemical agents[]" and did not see any force used on Carmichael or use any force on him, adding the allegations are without merit.

- **Defendant Knight** (ADOC SGT / CERT member) asserts he was present but did not use any force of Carmichael and has "no knowledge" of the incident. (Doc. 84-13 (Aff. Knight)).

- **Defendant Lewis** (ADOC OFF / CERT member) asserts he was present and assisted CERT escort inmates from their beds to the shower area, with some inmates hiding under their beds, and did not observe any abuse, assault or excessive force. He believes Carmichael's claims are unfounded. (Docs. 83-14 (Aff. Lewis)).

- **Defendant Luitze** (ADOC SGT / CERT member) asserts he was present and assigned the 37 mm less lethal gas gun and manned the post at the front right of the dorm. (Doc. 84-15 (Aff. Luitze)). He maintained that post and did not use force.

- **Defendant McClain** (ADOC CAPT / CERT member) asserts was present but did not use any force on Carmichael. (Doc. 84-16 (Aff. McClain)).

- **Defendant McCovery** (ADOC LT / CERT member) asserts he was present but did not use any force against Carmichael and all of the force he used was reported/documented. (Doc. 84-17 (Aff. McCovery)).

- **Defendant Norris** (ADOC SGT / CERT member) asserts that he was present, assigned to a conduct a shakedown, but did not use any force. (Doc. 84-18 (Aff. Norris)).

- **Defendant Pacheco** (ADOC LT / CERT member) -- same assertions as Arthur *supra*. He denies using any force against Carmichael. (Doc. 84-20 (Aff. Pacheco)).

- **Defendant Parker** (ADOC SGT / CERT member) asserts he was present and was assigned to man the 37 mm less lethal gas gun and positioned at front and center of the dorm. (Doc. 84-19 (Aff. Parker)). He observed several unidentified inmates not complying with orders. The CERT rovers in full riot gear were able to control and restrain them. Because of the gear, he could not identify CERT members and exact locations. He maintained his post and did not use any force.

- **Defendant Patterson** (ADOC LT / CERT member) asserts he was present but did not use any force on Carmichael and has "no knowledge of this incident." (Doc. 84-21 (Aff. Patterson)).

- **Defendant Pryor** (ADOC LT / CERT member) asserts he was present but did not use any force against Carmichael, and the force he used was reported/documented. (Doc. 84-22 (Aff. Pryor)).

- **Defendant Robinson** (ADOC OFF / CERT member) asserts he was present and assisted CERT escort inmates from their beds to the shower area, and with some inmates hiding under their beds, but did not observe any abuse, assault, or use of excessive force. (Docs. 84-23 (Aff. Robinson)).

- **Defendant Sanders** (ADOC OFF / CERT member) asserts he was present but did not observe any abuse, assault, or use of excessive force, and he does not know, nor can he identify Carmichael, adding that the allegations against him are false. (Doc. 84-24 (Aff. Sanders)).

- **Defendant Streeter** (ADOC WARDEN / CERT member) -- same assertions as Arthur *supra*. He denies using any force against Carmichael. (Doc. 84-26 (Aff. Streeter)).[63]

- **Defendant Terry** (ADOC OFF / CERT member) asserts he was present but did not use any force on Carmichael and has "no knowledge" of the incident. (Doc. 84-27 (Aff. Terry)).

- **Defendant Tunstall** (ADOC OFF / CERT member) asserts he was present and assisted CERT secure inmates with flex cuffs behind their backs and escort them to the front of the dorm to be positively identified, prior to searching them and their property for weapons/contraband. He did not observe any abuse, assault, or use of excessive force. (Doc. 84-28 (Aff. Tunstall)).

- **Defendant Walker** (ADOC LT /CERT member) asserts he was present but did not use any force on Carmichael. (Doc. 84-29 (Aff. Walker)).

- **Defendant Wilson** (ADOC SGT / CERT member) asserts he was present with CERT to arrest all inmates identified as suspects for the Nov. 7 incident and to conduct an institutional count. (Doc. 84-30 (Aff. Wilson)). Per Wilson:

    > We ordered all inmates to take down all the clotheslines that were hanging. Some inmates complied but most did not. We began taking down the clotheslines on our own. Another Officer was taking a clothesline down off of an inmate's bed and broke the broom handle that the line was tied to. When the approximately 114 inmates inside B-Dorm observed this they all rose up off their beds and began shouting obscenities and threatening us. Numerous inmates made death threats to us and were making statements such as "We run this bitch!", "This is 2016. Fuck the police!" and "We on ready' We will jump this bitch off in here!" These are only a few that I recall hearing. Several inmates were observed with knives and broomsticks in their hands to be utilized as weapons. our only option at this time was to attempt to deescalate the situation so we could walk out of the dorm with our lives. We were inside the dorm for approximately 5 minutes attempting to talk our way out. We were outnumbered ... 114 inmates and ... 10 officers. I have never been so afraid for my life like I was during this uprising. Thankfully, we were able to exit the dorm safely. The rest of the day and November 8th was utilized conducting an investigation to determine the inmates who had the weapons and who were making the threats. ... Carmichael... was identified as a suspect from the incident and it was determined that ... Carmichael communicated intent to inflict harm to staff with a weapon and also played a leadership role. ... once entry was made inside of the dormitory, all inmates were given orders to lie down on their assigned beds and to place their hands behind their backs. ... Carmichael and numerous other inmates failed to comply with the orders given. .... I did not use any force on .... Carmichael. At no time did I observe any excessive force being used against .... Carmichael by .. CERT ... I have not violated any of ... Carmichael's rights and any and all allegations made by ... Carmichael are false and full of malice. All actions on my behalf were made in a professional manner and within the scope of my duties.

---

[63] Carmichael's narrative disputes this.

On July 11, 2018 and February 22, 2019, **Defendant McQuirter** (CERT member) and **Defendant Whitley** (officer) appeared, answered, and filed a special report, denying the allegations and submitting affidavits. (Doc. 86; Doc. 86-1 (Aff. McQuirter); Doc. 86-2 (Aff. Whitley); Doc. 102 (answer)). Defendant McQuirter makes the same assertions as Arthur *supra*, and denies using any force against Carmichael.[64] Defendant Whitley assisted CERT in searching the dorms, but did not see any force used on Carmichael and did not use any force on him.

On February 22, 2019, **Defendant Smith (**ADOC Correctional Captain / CERT Commander (Central)), appeared, answered and filed a special report, denying the allegations and submitting affidavit in support. (Doc 102; Doc. 103; Doc. 103-1 (Aff. Smith)). Per Smith, he was not present during the search and so did not and could not have used force on Carmichael.

On September 18, 2019, **Defendant Edwards** (former ADOC Correctional Sergeant / CERT member), appeared, answered and filed a special report, denying the allegations and submitting affidavit in support. (Doc. 116; Doc. 117; Doc. 117-1 (Aff. Edwards)). Per Edwards, he was present but did not observe any abuse, assault or use of excessive force against Carmichael, and does not know him or can identify him, and the allegations against him are false.

On November 15, 2019, **Defendant Melton** (former ADOC Correctional Officer / CERT member) and **Defendant Stanford** (ADOC Correctional Sergeant / CERT member), they have appeared, answered and filed a special report denying the allegations and submitting affidavits in support. (Doc. 130; Doc. 131; Doc. 131-1 (Aff. Melton); Doc. 131-2 (Aff. Stanford)). Per Melton, he was present as he responded to a call for an active disturbance as a member of CERT and was assigned to carry the shield and led CERT rovers around the dorm to restrain all non-compliant inmates. (Doc. 131-1 (Aff. Melton)). Melton placed the riot shield at the front of the dorm with CERT member Parker and assisted securing inmates in the dorm with flex cuffs to the rear (behind the back) and escorting secured inmates to the front of the

---

[64] Carmichael disputes this in his narrative. Byer also specifically names McQuirter -- as witnessing him hit Carmichael with a baton. (Doc. 176-2 at 2 (Aff. Byer)).

dorm to be positively identified prior to searching them and their property for weapons and contraband. (Id.) Per Stanford, he was present with CERT but did not use any force against Carmichael and all force he used was reported/documented. (Doc. 131-2 (Aff. Stanford)).

On January 8, 2020, **Defendant Harrison** (ADOC employee / CERT member (Doc. 154 at 2) appeared, answered and filed a special report, stating that while present, he "does not recall observing anyone use force" on Carmichael and would be unable to identify him. (Doc. 154 at 11; Doc. 155).[65]

Generally, Defendants collectively contend that on November 7, 2016, Warden Streeter conducted an investigation regarding inmates causing a disturbance toward the staff at Holman -- CERT ordered inmates to remove the sticks and blankets tied to their beds (tents). (Doc. 40 at 5 (citing Doc. 40-11 at 3)). On November 9, 2016, Warden Stewart requested CERT enter Holman for an institutional search, due to the number of inmate assaults and prison made weapons in the facility. (Id. (citing Doc. 40-6 (Aff. Stewart))). Inmates were ordered to lie down on their beds and place their hands behind their backs. (Id. at 6). Per Defendants, Carmichael refused to comply with lawful orders to do so. (Id. (citing Doc. 40-11 at 3)). As such, "[a] minimum amount of force was used and restraints were placed" on him. (Id. at 6 (citing Doc. 40-4 (Aff. Mitchell))). The ADOC Disciplinary Report for November 9, 2016 states: "Carmichael....was given several orders by the...CERT teams, to report to his assigned bed, lie down on his stomach, and place his hands behind your back....Carmichael failed to comply with the orders given." (Doc. 40-10 at 1). Carmichael was found not guilty regarding this disciplinary report because the hearing was not held within the prescribed time frame. (Doc. 40-10 at 3). Per use of force protocol at Holman and an ADOC requirement, Carmichael was taken to the Health Care Unit for an assessment (Doc. 40-3 at 2 (Aff. Kidd); Doc. 40-4 at 2 (Aff. Mitchell); (Doc. 40-16 at 2 (Aff. LPN Johnson)).

As background, with regard to medical care/treatment, Defendants assert that Carmichael's excessive force claims are unsupported by the body chart completed for him within hours of the 6:35 a.m.

---

[65] Harrison states in his report that his affidavit "shall be filed at a later date." (Doc. 154 at 2).

incident (at 9:00 a.m.), adding that his body chart shows no injuries. And according to non-party John-son,[66] who completed the body chart, she saw "no markings," "he did not complain of any injury or dis-comfort whatsoever," and Carmichael made "made no statements indicating he was injured." (Doc. 40-13 (Body Chart); Doc. 40-16 at 2 (Aff. Johnson); Doc. 40-17 at 4). Per Johnson "my education, training and experience qualified me to complete body charts and assess inmates for visible signs of injury, bruis-ing or lacerations." (Id. at 2). Johnson states that she:

> ...did not detect any indications of an injury, bruising, laceration or marking of any kind whatso-ever on his body....his vital signs were largely normal, with only a slightly elevated temperature which did not indicate trauma or significant internal injuries....Carmichael...did not complain of any injury or discomfort...or, from my observation, ever attempt to speak with me......

(Doc. 40-16 (Aff. Johnson at 2)).

On November 10, 2016, Carmichael submitted a Sick Call Request and notified prison officials that "I think my rib is cracked. Its [sic] hard and hurts to breath [sic], cough, sneeze, move or lay down." (Doc. 40-17 at 3). Carmichael received no medical care or treatment in response to this Sick Call Request. Carmichael received no medical care/treatment until November 23, 2016. (Doc. 40-17 at 1). This, despite Carmichael's contention that he repeatedly reported injuries and a need for medical care/treatment.

On November 23, 2016, Carmichael *again* reported injuries -- noting injuries to his right knee and left side, as trauma from an altercation -- he was unable to apply weight to his right leg or walk on his right leg and had acute burning pain. (Doc. 40-17). The Nurse referred Carmichael to a doctor for an assessment for rib and knee pain -- discoloration was noted to the knee and that his right side was tender to touch. (Id.) Carmichael was transported to Atmore Community Hospital ER as a "certified medical emergency" with chest pain and a hematoma: the radiology report indicated he had normal left rib series and mild osteoarthritis in his right knee, his diagnosis was that he fractured multiple ribs on his left side and bruised his right knee and lower leg. (Id.; Doc. 40-14). Carmichael reported being "hit in jail by a

---

[66] Non-party Johnson was the Holman pharmacy manager and "do[es] not routinely provide nursing care...although I may provide nursing care to inmates as circumstances may require." (Doc. 40-16 (Aff. Johnson)).

guard...in prison hit with a baton." (Doc. 40-14 at 14). Carmichael reported being "involved in disagreement with CERT 2 weeks ago." (Doc. 40-17 at 9). The doctor examining Carmichael found a very tender left side chest wall and at ribs 5-6 and that his right knee had an 8 inch bruise encompassing it. (Id.) The ER doctor's notes state: "[p]ain on Llower ribs, worked up earlier at jail and it showed bruised ribs and healing fracture from 11/2/16." (Doc. 40-14 at 15-17).[67]

Further, the ADOC Incident Report for "failure to obey a direct order of ADOC employee" provides details of the November 9, 2016 search, as well as facts leading to the incident, stating:

> ...CERT Team Commander...Streeter concluded an investigation into inmates making threats with weapons and a possible disturbance toward the staff at Holman....On November 7, 2016...CERT members entered B-Dormitory and ordered all inmates to remove sticks and tied up blankets from their beds. The inmates refused to comply and became very hostile and aggressive toward the CERT members. The inmates gathered in a threatening and intimidating manner around the CERT members stating, "This is 2016, and we run this, slavery is over with, we already done killed one of y'all." Several unidentified inmates were observed with handmade knives in their possession. The CERT members were able to exit the dormitory without incident. The inmates with handmade knives were later identified by the CERT members through IMAS. On November 9, 2016, at approximately 6:35 a.m......CERTs entered B-Dormitory to arrest the suspects......All inmates were given orders to report to their assigned beds, lie down, and place their hands behind their back. The following inmates failed to comply with the orders given....Leon Carmichael B/165648....CERT....used force to include impact weapons and physical force on the above mentioned inmates to get them to comply with the orders given....The inmates were arrested and escorted to the health care unit for medical assessments.....

(Doc. 40-11 at 3). The narrative summary indicates that the search resulted in the confiscation of 30 handmade knives; 11 inmates charged with failure to obey a direct order of an ADOC employee and allowed to remain in population pending the disciplinary action; and 21 inmates, including Carmichael, transferred to segregation pending disciplinary actions for failing to obey a direct order, gathering in a threatening/intimidating manner, and unauthorized possession of a weapon or device that could be used as a weapon (as identified as a participant in the November 7th incident). (Id. at 4). See also Doc. 40-12 at 1-3 (11/9/16 Duty Officer Report (D.Fails))).

---

[67] Defendants suggest that any injuries result from Carmichael being sexually assaulted by an inmate earlier -- that he is trying "to hide the fact that his injuries were caused by a [prior] forced sexual encounter in prison (or, in the alternative, a consensual sexual encounter in prison)." (Doc. 40 at 8-9).

## II.    **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c)(1)-(4) provides as follows:

**(c) Procedures.**
**(1) *Supporting Factual Positions*.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2) *Objection That a Fact Is Not Supported by Admissible Evidence*.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3) *Materials Not Cited*.** The court need consider only the cited materials, but it may consider other materials in the record.

**(4) *Affidavits or Declarations*.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

The movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the non-movant fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing ... the nonmov[ant's]... burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the

matter…. '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11ᵗʰ Cir. 1992).

## III.    Conclusions of Law

## A.    Immunity Defenses

To the extent Carmichael is proceeding against these defendants in their *official* capacities, the Court finds as follows.  The Eleventh Amendment, which specifically prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by citizens of that state." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998).  "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." Id. (citing Kentucky v. Graham, 473 U.S. 159, 166-167 (1985)).  Indeed, it is well settled that the Eleventh Amendment bars Section 1983 claims for monetary damages against the state or an agency of the state. Gafford v. Dunn, 2016 WL 7650680, *4 (N.D. Ala. Dec. 8, 2016), Report and Recommendation *adopted* by 2017 WL 57428 (N.D. Ala. Jan. 5, 2017)) (citing Alabama v. Pugh, 438 U.S. 781 (1978)).  Unless there has been a "legitimate abrogation of immunity by Congress or a waiver of immunity by the state being sued, the Eleventh Amendment is an absolute bar to suit by an individual against a state or its agencies in federal court." Id. (quoting Gamble v. Florida Dept. of Health & Rehab. Servs., 779 F.2d 1509, 1511 (11th Cir. 1986)).[68]

---

[68] Eleventh Amendment immunity may also apply to certain equitable forms of relief, "if the relief in essence requires a state to expend money for past action" but it "does not apply to actions against state actors for purely prospective injunctive relief, even if that relief may have an ancillary effect on state treasuries." Gafford, 2016 WL 7650680 at *4 (citing Edelman v. Jordan, 415 U.S. 651, 666 (1974) and Ex Parte Young, 209 U.S. 123 (1908)).  Under the exception recognized in Ex parte Young, courts may allow "suits against state officers seeking prospective equitable relief to end continuing violations of federal law." Id. (citation omitted). Carmichael seeks equitable relief in the form of a requirement that Defendants take "affirmative action" in the future to discontinue their "unconstitutional and unlawful act, policies, or practices." However, on summary judgment Carmichael did not provide any evidence in support of this argument to indicate that prospective equitable relief is appropriate.

The parties do not dispute that the Defendants, employed as correctional officers or medical providers for the State of Alabama via the ADOC, are state actors. Accordingly, the defendants, employed by the State of Alabama at the time, are immune from suit in their official capacities. See Parker v. Williams, 862 F.2d 1471, 1476 at note 4 (11th Cir. 1989), *overruled on other grounds in* Turquitt v. Jefferson Cty. Ala., 137 F.3d 1285 (11th Cir. 1998) ("[S]uits against an official in his or her official capacity are suits against the entity the individual represents[]"). Thus, the summary judgments as to the defendants in their *official* capacities are **GRANTED**.

Regarding *individual* capacity claims, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). The evidence indicates the defendants were acting within their discretionary authority at all times when the incident occurred, and Carmichael does not dispute such. (Doc. 176 at 21). Thus, defendants are entitled to qualified immunity *unless* Carmichael can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. Belcher v. City of Foley, Ala., 30 F.3d 1390, 1395 (11th Cir. 1994). Therefore, the Court will now address whether this action identifies any constitutional violation. See, e.g., Horton v. Morgan Cty. Sheriff's Dept., 2016 WL 6576986, *6-7 (N.D. Ala. Nov. 7, 2016) (discussing same).

As an initial matter, to the extent the Complaint names **Defendants Wall** and **Langford** in Carmichael's claims of excessive force and/or failure to protect, there are no facts in the Complaint or evidence of record to support said claims, resulting in summary judgment being **GRANTED** in their favor on same.

B.    Section 1983: Excessive Force

Carmichael alleges Section 1983 claims for excessive force against the defendants, both supervisory officials and non-supervisory officials. "In order for a plaintiff to establish a claim under 42 U.S.C.

§ 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." *Martinez v. Burns*, 459 Fed. Appx. 849, 850–851 (11th Cir. 2012) (citing *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)). The parties do not dispute Defendants (correctional officers / medical providers for the State of Alabama) are state actors. Thus, Carmichael must establish the defendants personally acted to deprive him of a constitutional right.

Additionally, "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of *respondeat superior* or vicarious liability.'" Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (citation omitted). If a supervisor's liability cannot be established based on the supervisor's personal participation in the complained acts, a plaintiff must show a causal connection between the supervisor's actions and the alleged constitutional deprivation. Oliver v. ADOC, 2019 WL 3402038, *2 (S.D. Ala. Jun. 28, 2019), Report & Recommendation *adopted by* 2019 WL 3400695 (S.D. Ala. Jul. 26, 2019) (emphasis added):

> ... supervisory liability under § 1983 occurs *either* when the supervisor personally participates in the alleged unconstitutional conduct *or* when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. .....

See also Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. Valdes v. Crosby, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)). "The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." Oliver, 2019 WL 3402038 at *2 (citing Cottone, 326 F.3d at 1360). A custom is established by showing "a longstanding and widespread practice [such that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (A custom

requires showing a practice so settled and permanent that it takes on the force of law). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." West v. Tillman, 496 F.3d 1321, 1329 (11th Cir. 2007) (citation omitted).

### 1. **Defendants Not Present**

As to the first criteria, personal participation, **Defendants Culliver, Dunn, Fails, Kidd, Mitchell, Raybon, Scarbrough, Smith**, **Stewart** and **Vignolo,** assert that they were not present at either Holman and/or in B-Dorm at the time of the incident. See *supra*. The uncontradicted evidence indicates that ADOC officials **Culliver, Fails, Kidd, Raybon, Scarbrough** and **Smith** were either not present at Holman at the time, or were not present in the B-Dorm. See *supra* Section I. Carmichael has failed to allege otherwise. Additionally, while **Dunn** has not submitted an affidavit confirming his presence (that he was not present either at Holman or at B-Dorm), Carmichael does not allege that he personally participated in the alleged acts. Moreover, **Vignolo** attests to being stationed in the Main Hall as security versus being present in B-Dorm, and Carmichael has failed to allege otherwise. Carmichael does not allege that Vignolo personally participated.

As to **Defendants Wall** and **Langford,** the Complaint is completely devoid of any allegations that support such claims against them.

**Stewart** and **Mitchell** deny they were present in B-dorm during the alleged used of excessive force. Carmichael alleges that both were present, as attested to by fellow inmates Byer and Johnson (Doc. 176 at 16), but no allegation is made that they personally participated in the alleged excessive force.

Because Carmichael has failed to allege personal participation by these defendants, Carmichael must show a causal connection between the supervisors' actions and the alleged constitutional deprivation. With two possible exceptions, **Mitchell** and **Stewart,** the record is devoid of evidence establishing that these defendants are causally connected to CERT's actions. Consequently, Carmichael's claim fails as to

**Culliver**, **Dunn, Fails, Kidd, Langford, Raybon, Scarbrough, Smith**, **Vignolo** and **Wall**, such that the summary judgments are **GRANTED** on Carmichael's excessive force claim.

2. <u>**Defendants not present and who deny using any force**</u>

As for **CERT defendants Edmonds, Griffin, Jones, Luitze,** and **Parker**, these defendants assert impossibility due to their physical presence ("maintained" or being "stationed") elsewhere <u>and</u> based on their specific allegations that they did not use <u>*any*</u> force on Carmichael.  Namely, these defendants contend that they were assigned specific duties/posts which *precluded* their ability to engage with any inmates during the search (i.e., they did not engage with Carmichael during the incident).  (Doc. 84 at 19-20).  The record indicates that Griffin was posted at the bathroom wall, and Edmonds, Jones, Luitze, Parker were posted at the front of B-dorm.  <u>See</u> *supra*.[69]  These officers affirm via affidavits that they secured their posts and did not use force on any inmates in B-Dorm on November 9th.  In response, Carmichael has failed to address these affirmations or rebut them in any way, and the record is void of any indication or suggestion that these defendants personally used force against Carmichael.  Carmichael's summary judgment response simply notes where defendants Edmonds, Griffin, Luitze and Parker were assigned/stationed (failing to even address Jones).  (Doc. 176 at 4).  Consequently, Carmichael has failed to carry his burden of showing a genuine issue of material fact exists as to whether or not *these* CERT defendants used excessive force against him.  <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 11th Cir. 1986) ("[S]ection 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation[]").  Accordingly, the summary judgments of **defendants Edmonds, Griffin, Jones, Luitze,** and **Parker** is **GRANTED** for Carmichael's claim of excessive force.

3. <u>**Defendants who were present but deny using any force**</u>

**CERT Defendants Arthur, Duren, Finklea, Fountain, Gaston, Hadley, Knight, McClain,**

---

[69] Edmonds assigned to a position at the left of B-Dorm and did not use any force during the incident.  (Doc. 84-6).  Parker remained at his position at the front center of B-Dorm.  (Doc. 84-19). Griffin stood watch atop the bathroom wall.  (Doc. 84-31). Luitze maintained his post at the front right of B-Dorm.  (Doc. 84-15).

**McCovery, Norris, Pacheco, Patterson, Pryor, Snelson, Stanford, Terry, Walker, Whitley** and **Wilson** deny using _any_ force against Carmichael, and affirm such by affidavits. See *supra*. In response to summary judgment, Carmichael makes no allegations and offers no evidence to refute their contentions as well as fails to connect any of *these* defendants to his excessive force allegations. Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990) (finding that a conclusory allegation without supporting evidence "should be discounted[]"). Beyond acknowledgment that these defendants are CERT members who participated in the incident, the record is void of facts connecting them personally to Carmichael's claims. LaMarca v. Turner, 995 F.2d 1526, 1536 (11th Cir. 1993) (A plaintiff must connect an official's act or omission to the alleged constitutional deprivation to establish liability). While the Court is required to draw all reasonable inferences in favor of the non-movant at this juncture, those inferences must still be based on facts in the record. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). Carmichael has not provided such facts of record to rebut summary judgment. Thus, Carmichael has failed to establish a causal connection between *these* defendants and the alleged harm. Thus, **Arthur, Duren, Finklea, Fountain, Gaston, Hadley, Knight, McClain, McCovery, Norris, Pacheco, Patterson, Pryor, Snelson, Stanford, Terry, Walker, Whitley** and **Wilson** motions for summary judgments are **GRANTED** on Carmichael's claim of excessive force.

**C.** **Section 1983: Failure to Protect/Intervene**

Carmichael asserts failure to protect claims against all of the Defendants. A prison official violates the Eighth Amendment when he or she acts with deliberate indifference to a substantial risk of serious harm to an inmate. Farmer v. Brennan, 511 U.S. 825, 828 (1994). "[A]n officer who is present at the scene [of an altercation] and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) (citation omitted). However, an officer may "only" be liable for failing to protect if he was "in a position to intervene[,]" but failed to do so. Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000).

As stated *supra*, **Defendants Culliver**, **Dunn, Fails, Kidd, Raybon, Scarbrough, Smith**, and **Vignolo,** were not present either at Holman and/or in the B-Dorm at the time of the incident. Carmichael has failed to allege otherwise or show that these defendants personally participated in the use of force against him. See *supra*. Carmichael has also failed to allege a causal connection between an action of any of these defendants and the alleged force used. Carmichael has further failed to plead any facts indicating that these defendants were in a position to take reasonable steps to protect him and/or to intervene but failed to do so. Thus, there can be no liability for these defendants for failing to protect/intervene as to Carmichael. Hartley, 193 F.3d at 1269; Brown, 906 F.2d at 671.

As to **Defendants Wall** and **Langford,** the Complaint is completely devoid of any allegations that support such claims against them.

Summary judgment is **GRANTED** in favor of **Culliver**, **Dunn, Fails, Kidd, Langford, Raybon, Scarbrough, Smith**, **Vignolo** and **Wall**, on Carmichael's claim of failure to protect.

## D.     Eighth Amendment: Denial/Delay of Medical Care

Carmichael alleges that he was denied medical care (including delayed medical care) by **Defendants Fails, Kidd, Mitchell, Raybon, Stewart** and **Vignolo;** nurses **Langford** and **Wall;** and all **CERT defendants.**[70] Specifically, Carmichael alleges:

> ...a lot of the injured inmates were refused a body chart and treatment by the nurses on duty, and was instructed to sign up for sick call, causing the inmates not to receive a body chart and treatment until days after the assault....
>
> ***
>
> ...about 20 minutes later [after allegedly being injured]..I was taken to the to the infirmary. On the way there a riot team (Cert team) officer told me, " Don't say shit unless asked a question. Keep your fucking mouth shut. Answer the nurse and that's it. Say anything and that's your ass!!". When I got in the infirmary the nurse asked me my name, AIS #, took my blood pressure and my temperature. Without even looking at or examining me she said, "okay he can go." I started to tell her that I couldn't breath [sic] and the riot team (Cert team) officer slapped me in the mouth, busted my lip and said "Bitch didn't I tell you to shut the fuck up? The nurse said you can go. Say something else and Im [sic] going to fuck you up." I was taken from the infirmary and never examined

---

[70] Carmichael alleged that unnamed nurses (1, 2, 3, 4) "refuse[d] to provide a body chart and Medical care to the inmates assaulted[]" on November 9, 2016. (Doc. 1 at 20 at ¶13). However, no other correctional nurses have been made defendants in this case.

25

for injuries….taken back to B-Dorm and placed back in the bathroom area…later I was taken to segregation….

Every day…I also told them [Cert team officer, Sgt. Lt. and COI]…that I could not breath [sic], I could barely walk or stand up and that I was in pain. They all told me to tell the nurse at pill call. At pill call the nurses told me to fill out a sick call slip. Every day I filled out and turned in sick call slips but was never taken to the infirmary….I continued to complain to every officer, the segregation review board Warden Raybon and the pill call nurses every time they came around about me not being able to breath [sic], not being able to stand, put pressure or walk on my right leg and the pain I was in. I keep putting in sick call forms but nothing never happened. The day before Thanksgiving COI Officer McCants…asked me if I wanted to go to sick call and I said yes.

When I got to sick call Nurse Dixon and Nurse Walls saw the extent of my injuries and asked me how did it happen. I told them and they asked me had I been in the condition I was in since Nov 9th and I said yes. Nurse Walls said take me to the infirmary immediately to see the doctor….The Dr saw me and immediately asked me how long Id [sic] been like I was and what happened.  After I told him he too asked me had I been in a lock up cell …since Nov. 9th and I said yes. …The Dr…had the X ray tech called to the institution immediately, had 8 X rays done of my leg and ribs and called his supervisor who told him to get me to the emergency room immediately after he informed his supervisor of the X ray results and his examination of my injuries.  Captain Fails tried to just bring me back to segregation but the Dr told him that I had to be rushed to the emergency room….Captain Fails was making excuses….the Dr instructed Captain Fails to have me placed on the infirmary medical ward. I was left on the medical ward from 11 something that morning until after 7:00 pm after the Dr left before Captain Fails finally had Lt. Kidd and COI Villignoli [sic] taken me to Atmore Hospital…The Dr had my leg X ray'd….three (3) hours later I was given pain meds and muscle relaxer and told by the Dr that I had several broken ribs, contusions and no broken bones in my leg…I was assaulted [and] denied medical treatment for 2 weeks and placed in segregation for no reason what so ever [sic]…..

(Doc. 1 at 9-13).  Thus, as alleged, Carmichael's medical claim is one for deliberate indifference to his medical needs due to the delay/denial in his treatment/care from November 9 (the date of the incident) to November 23 (the date on which he received treatment).

Additionally, in response to summary judgment, Carmichael alleges "cover-up[s]" at the prison, and that "[t]he medical records maintained by the defendants places not only their personal credibility in question, but renders suspect all of the official documents maintained by the ADOC, including investigative reports, logs, employee affidavits executed by people facing liability, and other 'evidence.' It is totally inexplicable why Carmichael's body chart reflects that he sustained no injuries, made no complaints about breathing difficulties, and all of his vital signs were within normal ranges, but then the hospital records show otherwise."  (Doc. 176 at 18, 20).

The Eighth Amendment prohibits, applicable to the states through the Fourteenth Amendment, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII; Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011). The Eighth Amendment does not permit a state actor's "deliberate indifference to serious medical needs of prisoners." Bingham, 654 F.3d at 1175. A prison official acts with deliberate indifference to an inmate's safety when he "knows of and disregards an excessive risk to inmate health or safety[.]" Farmer v. Brennan, 511 U.S. 825, 837 (1994). Similarly, a prison official acts with deliberate indifference to an inmate's medical needs by denying or delaying access to medical care. Erickson v. Pardus, 551 U.S. 89, 90 (2007).

> As summarized in Riggins v. Stewart, 2019 WL 4725158, *11 (S.D. Ala. Sept. 26, 2019):
>
> Deliberate indifference to an inmate's serious medical need violates the Eight Amendment's pro-hibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). However, not all denial of medical treatment equates to a constitutional violation. Id. at 105, 97 S. Ct. 285. To establish deliberate indifference to a medical need, a plaintiff must allege facts to need the objective and subjective prongs discussed previously. That is, first, the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 n. 9 (2002)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted). Second, a plaintiff must satisfy the subjective requirement of an Eighth Amendment denial of medical care claim by demonstrating "deliberate indifference" to a serious medical need, that is: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010).

See also e.g., Alsobrook v. Alvarado, 477 Fed. Appx. 710, 712 (11th Cir. 2012) ("[w]hen viewing the allegations in the amended complaint in the light most favorable to Alsobrook, we find....sufficient facts to demonstrate that his injuries[ ] constituted a serious medical need that Medina knew about but delayed for almost two hours in taking him for medical treatment, causing further injury, when there was no justi-fiable reason for the delay[]") (footnote omitted); Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010) ("a 'serious medical need' is 'one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment[]'"); Bozeman

v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (subjective knowledge requires that defendant "'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* [ ] must also draw the inference[]'") (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994) (emphasis added); Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) (deliberate indifference may be met where a prisoner is subjected to repeated examples of delayed or denied medical care and when personnel fail to respond to a known medical problem).

First, with regard to **Defendants Langford** and **Wall,** Carmichael makes <u>no</u> specific claims against these correctional nurses -- with regard to *their* denial/delay of medical care. (Doc. 1 at 20 at ¶¶ 11-12). As to Defendant Wall, the only evidence of record indicates that she did not even see Plaintiff until November 23, 2016, when she assessed him and referred him to a provider on the medical staff for additional care. (Doc. 42-4 (Decltn. Wall)). Carmichael also agrees that Wall acted in response to seeing his medical condition the first time she saw him and the extent of his injuries. After which other medical care occurred "immediately" (sent to the doctor, to the X-ray tech, to the emergency room). (Doc. 1 at 11). Concerning Defendant Langford, Carmichael makes <u>no</u> allegations against him in the Complaint. The only evidence of record indicates that Langford did not see Carmichael until November 25, 2016, that he did not receive any complaint from Carmichael, and that he did not have any other indication that Carmichael required medical attention or that had failed to receive adequate medical care. (Doc. 42-3 (Decltn. Langford)). As such, **Langford's** and **Wall's** motion for summary judgment on Carmichael's claim of denial/delay of medical is **GRANTED.**

## E.   Other Claims

Carmichael alleges state law claims for assault and battery, and claims for slander and harassment, against all defendants. Defendants do not substantively address these claims, instead asserting that the Court should grant summary judgment on the federal claims prompting a declination to exercise supplemental jurisdiction over any state law claims. (Doc. 40 at 16-17; Doc. 84 at 22-23; Doc. 103 at 23; Doc. 117 at 23; Doc. 131 at 23; Doc. 154 at 16).

1.      **State Law Claims for Assault and Battery**

Carmichael's state law assault and battery claims are rooted in his Section 1983 claim -- namely, the very same incident and allegedly violative acts (use of excessive force against him).  As explained in Howard v. Hudson, 2014 WL 5500731, *12 (S.D. Ala. Oct. 30, 2014):

> In Alabama, the elements of an assault and battery claim are:

>> "'[A]n intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt if not prevented.'" .... A successful assault becomes a battery, which consists of the touching of another in a hostile manner.

> *Wright v. Wright,* 654 So.2d 542, 544 (Ala.1995). In a civil case, the elements of battery are: 1) that the defendant touched the plaintiff; 2) that the defendant intended to touch the plaintiff; and 3) that the touching was conducted in a harmful or offensive manner. *Ex parte Atmore Community Hosp.,* 719 So.2d 1190, 1193 (Ala.1998). Additionally, "[a] battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another." *Surrency v. Harbison,* 489 So.2d 1097, 1104 (Ala.1986). *See also* *Perkins v. City of Creola,* 2010 WL 1960915, *18 (S.D.Ala. May 14, 2010)* (same).

As to **Defendants Wall** and **Langford,** the Complaint is completely devoid of any allegations that support such claims against them.  Moreover, defendants who were not physically present at Holman and/or the B-Dorm at the time (i.e., it would have been impossible for them to have assaulted and/or battered Carmichael due to their physical absence) are also due summary judgment.  Likewise, CERT **Defendants Edmonds, Griffin, Jones, Luitze,** and **Parker**, were assigned specific posts which precluded engagement with any inmates during the search (i.e., they did not engage at all with Carmichael), such that any use of force against Carmichael was an impossibility.  Accordingly, summary judgment is **GRANTED** in favor of **Culliver, Dunn, Edmonds, Fails, Griffin, Kidd, Jones, Langford, Luitze, Parker, Raybon, Scarbrough, Smith, Vignolo** and **Wall**, on Carmichael's state law assault and battery claims.

Moreover **CERT Defendants Arthur, Duren, Finklea, Fountain, Gaston, Hadley, Knight, McClain, McCovery, Norris, Pacheco, Patterson, Pryor, Snelson, Stanford, Terry, Walker, Whitley**

and **Wilson** deny using _any_ force against Carmichael, and affirm such by affidavits.  See _supra_.  Carmichael offers no evidence to refute their contentions and also fails to connect any of _these_ defendants to his excessive force allegations.  As such, summary judgments are **GRANTED** in favor of **Arthur, Duren, Finklea, Fountain, Gaston, Hadley, Knight, McClain, McCovery, Norris, Pacheco, Patterson, Pryor, Snelson, Stanford, Terry, Walker, Whitley** and **Wilson** as to Carmichael's state law assault and battery claims.

## 2. Slander & Harassment

Carmichael alleges claims for slander and harassment against all defendants.  However, as noted _supra_, these claims are stated only in his request for relief via use of the words "slander" and "harassment." Nevertheless, regarding slander, Carmichael's complaint is similar to that in J.M. v. Selma City Bd. of Ed., 2016 WL 7030452, *8 (S.D. Ala. Nov. 16, 2016), Report & Recommendation _adopted by_ 2016 WL 7031901 (S.D. Ala. Dec. 1, 2016):

> In Alabama, alleged defamation is considered by the Court as either slander or libel. _Blevins v. W.F. Barnes Corp._, 768 So. 2d 386, 390 (Ala. Civ. App. 1999). To state a case of either slander or libel, a party must show that a defamatory communication was made. _See, e.g., id._ The elements of a defamatory communication are
>
>> 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.
>
> _Drill Parts and Service Co., Inc. v. Joy Mfg. Co._, 619 So. 2d 1280, 1289 (Ala. 1993) _citing McCaig v. Talladega Publishing Co._, 544 So. 2d 875, 877 (Ala. 1989). Plaintiff has made no allegation as to what statement or statements made ..... were defamatory.... Plaintiff has made no allegation as to when Defendants made any unprivileged communication of a defamatory nature to a third party.....Since a material element of a defamation cause of action has not been pleaded, this claim necessarily fails. _See Mack_, 486 Fed.Appx. at 6.

Carmichael has failed to allege, plead, or identify any false and defamatory statement about him, made via an unprivileged communication to a third party, to support a claim for slander. And to the extent Carmichael endeavors to assert a _federal_ slander claim, such is not cognizable.  See, e.g., Charles v. Scarberry, 340 Fed. Appx. 597, 599–600 (11th Cir.2009).  See also Thompson v. Barbour Cty. Sheriff's Dept.,

2009 WL 89284, *2 (M.D. Ala. Jan. 12, 2009): "....the law is well settled that a 42 U.S.C. § 1983 action cannot be predicated upon the theory of slander.... *Paul v. Davis,* 424 U.S. 693 ... (1976); *see also Von Stein v. Brescher,* 904 F.2d 572 (11th Cir.1990)."

For harassment, while Carmichael does not specify the type, he appears to attempt to assert a constitutional violation given his allegations of verbal and physical threats. However, as noted in Grimage v. Hilliard, 2016 WL 7049247, *9 (M.D. Fla. Dec. 5, 2016):

> ....Such allegations do not state a claim of federal constitutional dimension. See Hernandez v. Fla. Dep't of Corr., 281 Fed.Appx. 862, 866 (11th Cir. 2008) (per curiam) (citing Edwards v. Gilbert, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989)) ("Hernandez's allegations of verbal abuse and threats by the prison officers did not state a claim because....verbal abuse alone is insufficient to state a constitutional claim.")....
>
> > "[M]ere threatening language and gestures of a custodial office do not, even if true, amount to constitutional violations." Coyle v. Hughes, 436 F.Supp. 591, 593 (W.D. Okl[a]. 1977). "Were a prisoner ... entitled to a jury trial each time that he was threatened with violence by a prison guard, even though no injury resulted, the federal courts would be more burdened even with trials of prisoner suits...." Bolden v. Mandel, 385 F.Supp. 761, 764 (D. Md. 1974). See Johnson v. Glick, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973) (the use of words, no matter how violent, does not comprise a section 1983 violation).
>
> McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir.).....

See also e.g., Richburg v. Department of Corr., 2019 WL 6769003, *3 (M.D. Ala. Nov. 8, 2019), Report & Recommendation *adopted by* 2019 WL 6769308 (M.D. Ala. Dec. 11, 2019) (same). Based on foregoing, Carmichael's civil harassment claim lacks merit. As such, Carmichael's slander and harassment claims against all Defendants are **DISMISSED.**

**F.    Declaratory and Injunctive Relief**

Carmichael requests entry of a declaratory judgment and injunctive relief as to all of the defendants. However, the record indicates that as of April 13, 2017, Carmichael was transferred from Holman Correctional Facility to Donaldson Correctional Facility, and Carmichael has not alleged that he will or is likely to return to Holman. (Doc. 6). Due to Carmichael's transfer, his declaratory and injunctive relief requests are moot. As set forth in Lolley v. Louisiana Corr. Servs., 2012 WL 2154500 (S.D. Ala. Jun. 13, 2012):

......his claim for injunctive relief is moot. *Wahl v. McIver,* 773 F.2d 1169, 1173 (11th Cir.1985) ("[A]n inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred."); *Harrison v. Culliver,* 2008 WL 2788352, at *3 (S .D.Ala. Jul. 17, 2008) (same); *see also Harkless v. Toney,* 2012 WL 1946506, at *6 (S.D.Ala. Mar. 16, 2012) ("Because a claim for injunctive relief is a prospective remedy, when the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury.") (quoting *Adler v. Duval Cnty. Sch. Bd.,* 112 F.3d 1475, 1477 (11th Cir.1997) (internal punctuation omitted))....

See also Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir.1988) ("Absent class certification, an inmate's claim for injunctive and declaratory relief in a § 1983 action fails to present a case or controversy once the inmate has been transferred[]").

Moreover, the relief (declaratory and injunctive) sought by Carmichael is *prospective* (future look-ing). "Declaratory relief is by its nature prospective." McGee v. Solicitor Gen. for Richmond Cty., Ga., 727 F.3d 1322, 1325 (11th Cir. 2013). "In contrast....[to] a claim for money damages [that] looks back in time and is intended to redress a past injury." Adler v. Duval Cnty. Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997). To have standing to seek declaratory relief, a plaintiff "'must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.'" Koziara v. City of Casselberry, 392 F.3d 1302, 1305 (11th Cir. 2004). "[T]he continuing controversy.....it must be real and immediate, and create a definite, rather than speculative threat of future injury." Emory v. Peeler, 756 F.2d 1547, 1552 (11th Cir. 1985). A remote possibility of a future injury occurring is not adequate. Id. Likewise, "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief if the party alleges...a real and immediate – as opposed to a merely conjectural or hypothetical---threat of *future* in-jury." Church v. City of Huntsville, 30 F. 3d 1332, 1337 (11th Cir. 1994) (emphasis in original). Carmi-chael has not made a specific showing (or even an allegation) of any likelihood of being subjected to unlawful conduct (or future injuries) by a named Defendant *in the future.* See City of Los Angeles v. Lyons, 461 U.S. 95, 104 (1983) (merely asserting that one may again be subject to unlawful conduct does not generally give rise to standing to demand prospective relief). And as noted *supra*, Carmichael was

transferred from Holman and is currently incarcerated at a different facility.  For these reasons Carmichael's requests for declaratory and injunctive relief are dismissed as **MOOT.**

IV.    <u>Conclusion</u>[71]

It is **ORDERED** that the above-referenced motions for summary judgment are **GRANTED** as follows:

1) **Official capacity claims** against all of the defendants - **GRANTED;**

2) **Individual capacity claims**:

a) **Eighth Amendment excessive force claim** -- **GRANTED** as to Defendants **Arthur, Culliver, Dunn, Duren, Edmonds, Fails, Finklea, Fountain, Gaston, Griffin, Hadley, Jones, Kidd, Knight, Langford, Luitze, McClain, McCovery, Norris, Pacheco, Parker, Patterson, Pryor, Raybon, Scarbrough, Smith, Snelson, Stanford, Terry, Vignolo, Walker, Wall**, Whitley and **Wilson**;

b) **Eighth Amendment failure to protect claim** -- **GRANTED** as to Defendants **Culliver**, **Dunn, Fails, Kidd, Langford, Raybon, Scarbrough, Smith**, **Vignolo** and **Wall**;

c) **Eighth Amendment denial/delay of medical care claim** -- **GRANTED** as to Defendants **Langford** and **Wall**;

d) **State law assault and battery claims** --**GRANTED** as to Defendants **Arthur, Culliver, Dunn, Duren, Edmonds, Fails, Finklea, Fountain, Gaston, Griffin, Hadley, Jones, Kidd, Knight, Langford, Luitze, McClain, McCovery, Norris, Pacheco, Parker, Patterson, Pryor, Raybon, Scarbrough, Smith, Snelson, Stanford, Terry, Vignolo, Walker, Wall**, Whitley and **Wilson**;

e) **slander and harassment claims** –DISMISSED as to all Defendants; and

f) **Declaratory and/or injunctive relief claims** -- **MOOT.**

**DONE** and **ORDERED** this the **4th** day of **February 2020.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[71] **The motions for summary judgment of the defendants on the claims NOT granted in this order remain under advisement.**